MICHAEL ERSKINE et al., Appellants, vs. JOSEPH DE LA BAUM
et al., Appellees — Appeal from Bexar County.

The rule laid down in Hunter *vs.* Atkins, 3 Myline & Keen, 113, reviewed and
adopted.

Under the laws of the late republic of Texas, in force on the first day of June,
1844, an administrator could purchase from an heir of his intestate the in-
terest of such heir in the lands belonging to the succession. [6 Tex. 174.]

The vendor could not, at his option, set aside a purchase and sale so made,
without showing some fraud on the part of the administrator in procuring
such purchase.

This was a suit brought by the appellees (complainants in
the court below) to obtain the rescission of a sale of three
leagues of land which a part of the heirs of Joseph De la Baum
had sold to the appellant, Erskine, in 1844, on the alleged
ground of fraudulent representations made by Erskine, at the
time of the sale, and on account of inadequacy of the price
paid.

The bill also sought to set aside the sale of a house and lot
in the city of San Antonio, which had previously been sold
under an order of the probate court of Bexar county, as the
property of said Joseph De la Baum, and purchased by one
John Erskine, the son of the appellant, which said property
was ordered to be sold to pay debts due by an accumulation of
taxes on the estate for several consecutive years, there being no
personal estate from which said taxes could be raised.

The bill charges the appellant, Erskine, who was the admin-
istrator on the estate of said De la Baum, with collusion with
his son in selling said house and lot for less than its intrinsic
value. It also charges him with fraud in having availed him-
self of the information he had obtained as administrator of the
estate of Joseph De la Baum, of the real value and condition
of the estate and lands, in deceiving the complainants, in order
to obtain from them an unjust and unconscientious bargain in
the purchase of the three leagues of land; and it denies his
right, as administrator, and while acting as such, to purchase
any portion of the trust estate.

The bill does not allege that the children and heirs of Joseph

De la Baum, who sold the land to the appellant, had not full right and authority to make the sale, but it seeks to avoid it on account of the fiduciary character of the purchaser, and alleged fraudulent representations made by him as to its value and condition, and by which they were deceived in making the sale.

The bill calls upon the defendant to answer. He does answer, and in the same, unequivocally denies and repels every allegation and charge of fraud, false representation or unfair dealing on his part in making the purchase.

It appears from the answer that the complainants were put fully in possession of all the circumstances connected with the estate before they sold the land to the appellant; and that before the contract of sale was completed, one of the complainants, acting for himself, and as agent for the others, came to the country to ascertain the true condition of the estate, and after getting here, and ascertaining everything in connection with it, and the value of his rights and those whom he represented, he then completed and confirmed the sale.

The district judge decreed a rescission of the sale of the land made by the complainants to Erskine, and also a rescission of the sale of the house and lot in San Antonio under the order of the probate court; and thereupon the defendants appealed.

GILLESPIE and WEBB for appellants.

The answer shows that, at the time the sale of the land was finally consummated in Texas, the appellant was, in fact, no longer the administrator of the estate of Jose De la Baum, as the will of said De la Baum had been produced by his heirs and probated in court, and one of the complainants named as executor therein, and in consequence of which the appellant had resigned his administration on said estate, and was as free as any other person to make any contract respecting it.

But, even had this not been the fact, the circumstances under which the appellant held the estate as administrator were not such as to preclude him from making the purchase fairly and bona fide from the heirs, or any one of them. They were all

of age and capable of protecting their own rights; and his possession of the estate was only a nominal one to preserve and take care of it in the absence of the heirs, there being no debts to pay, except such as arose from an accumulation of taxes, and no distribution to make among minors or infant heirs incapable of protecting themselves.

As regards the allegations in the bill respecting the sale of the house and lot in San Antonio, the answer shows that so far as they are intended to impeach the validity of the sale and fairness of the transaction, they are untrue, and all the testimony in the cause sustains the allegations in the answer.

The decree of the court is erroneous, because there is no testimony in the record to sustain it. The mere allegations in a bill, unsupported by competent testimony, are insufficient to sustain a decree, and more especially when denied by the answer, as they are in this case.

The answer, when responsive to the allegations in the bill, is to be taken as true, unless disproved by two witnesses, or by one witness with strong corroborating circumstances. The answer in this case, so far from being disproved, is sustained by the testimony in the record, and under that answer and the proof, it was impossible for the court to decree a rescission of the sale without violating every rule of law and of chancery practice.

If the decision of the court in this case be correct, then the rule of law which requires a plaintiff to make out his own case is reversed, and the defendant must show that the allegations of the plaintiff are untrue; and even if such were the rule, we think that this case is brought within it, as it is shown here that the plaintiff's allegations are not true, either as to the deceptions said to be practiced in procuring the sale, or in respect to the value and condition of the land.

Every allegation in the bill charging misrepresentation of any character, or of fraud, is directly met and denied in the answer, and no effort or attempt is made to sustain one of them by proof. Everything which has been elicited in the examination tends to confirm the answer. The bill alleges that

the Capote lands lie in Gonzales county; the answer alleges that the principal party, Jose De la Baum, came with him to said county; staid two days at his house on the land, visited his old acquaintance and friend, Mr. L. Navarro; and the deed which is asked to be annulled shows that he was in the clerk's office at Gonzales, acknowledged the execution of the deed as to himself, and proved it as to the other two.

Every part of the transaction shows the fairness of defendant. He tells, in answer to the charge of misrepresenting to those unacquainted with our language, who the interpreter was · why did they not call upon him to prove the misrepresentation ? we could not establish a negative.

Then, all fraud being at an end, do not these parties stand in such a relation as to forbid their contracting ? They were better acquainted with the land than Erskine, having been raised in the country. Erskine was not entrusted by them to sell the land for them, nor directed by the law to do so. He was neither bound by contract, law or duty to dispose of this land for them; he had not the power to sell in any wise; the legal estate was not in him; not being under any such obligation, he was free to act. This doctrine is fully sustained in 2 Phil. Ev. (part 1), pages 337, '8 and '9, and the numerous authorities referred to. If any additional authority might be needed to this point, we would refer the court to the most learned and elaborate opinion, in the case of Kennedy's executors against Kennedy's heirs. [2 Ala. Rep. N. S. p. 606.] "There is no doubt that the trustee may, in all cases, openly and in his own right, purchase from his *cestui que trust,* or principal, provided it appear he has made a full and fair disclosure of his knowledge, and taken no improper advantage." [2 Phillips Ev. 339; Cowen & Hill's notes, part 1, and references.] "It will be seen by several of the authorities there referred to, that the trustee or agent against whom jealousy arises must, in general, be one having the power to sell or deal in the subject matter of what is confided to him. If constituted for other purposes, he does not come within the prohibition." [Id.]

J. A. PASCHAL, same side.

There are two points to which I will call the attention of the court in this case in behalf of the appellants.

1st. The appellant, as administrator of the estate of De la Baum, was the trustee of the creditors and not of the heirs. An executor is always the trustee of heirs, and has the seizin of property till delivered over to them; the administrator never has the seizin of property, especially of real property. One who creates a trust for the purpose of paying a debt, although there may be a residuary interest accruing to him after the payment of the debt, may sell to the trustee, inasmuch as the vendor is presumed to know what he placed in the hands of the trustee. In the case of an administrator, the law acts for the heirs, and devolves the trust upon him; an inventory and appraisement of the estate is made; also a tableau of the debts; therefore the heir does not labor under any disadvantage in selling to the administrator, unless there be actual fraud; in which case it must be proved as other fraud. The sheriff might buy the property of a plaintiff in execution, although he has a residuary interest.

2. When Erskine bought the land in Louisiana he was not administrator of the estate of Le Baum. He ceased to be such the moment he entered the borders of Louisiana. The form of the deed must be in accordance with the law of the place where the land is situated; but the capacity of the parties to contract, or buy or sell, is regulated by the law of the place where the contract is celebrated. If the laws of Louisiana permitted minors to sell lands without the intervention of legal authority, a sale there, by a minor, of land in Texas, would be good, if otherwise in conformity to the laws of Texas. Erskine had the legal capacity to purchase, according to the laws of Louisiana, as he was not, by the laws of that state, known as administrator.

HOWARD for appellees.

1. There is no doubt that Erskine was trustee at the time of the sale. He did not close the estate until months after his

purchase, when he surrendered his letters and proved up the will. It cannot be contested that the administrator is a trustee. This court has decided that the real as well as personal property vests in him. [ *Vide* also 4 How. U. S. Reps. 503.]

2. It is well settled that the trustee cannot purchase the trust property so long as the trust subsists. [Story's Eq. § 321; McCants *vs.* Bee, 1 McCord's Ch. Reps. 383; Portman *vs.* Taylor, 6 Eng. Cond. Ch. Reps. 102; 4 id. 286; 2 Caine, 183; 10 Vesey, 393; but more fully and at large, Michoud *vs.* Girod, 4 Howard U. S. Reps. 503; Butler *vs.* Haskell, 4 S. C. Eq. Reps. 682; 1 Gilman, 614.]

It has sometimes been said that the trustee might purchase, if it was not at his own sale; but the distinction does not exist, and there is no reason for it, as the public policy is quite as strong in the one case as the other. [1 Story's Eq. § 321; 1 McCord's Ch. R. 389; Story on Agency, p. 284, citing a late case from Sumner's Reports.] Indeed the danger of abuse would be greater in private sales. It has always been urged in extenuation of purchases by trustees, that they were made at fair public auctions, but the courts have never allowed them to stand, even when they have been fair and a full price paid. The beneficiary has the absolute right to set the sale aside. [1 Story's Eq. § 321.]

3. There is a class of cases which assert that the trustee may purchase if the trust relation is first dissolved, and there is no fraud or concealment, but that such a case is difficult to make out when there is any inequality of price. [1 Story's Eq. § 321.] This distinction is not maintained by the late cases, but if it were it does not help the appellant. His trust relation was subsisting; and by reference to his sworn inventory and appraisement, in the amended record, it will be seen that he valued the Capote tract at $12,000, one half of which he purchased at a little more than $1,200. The administrator ought to be held estopped by his own inventory and appraisement. But he utterly failed in his attempt to disprove it. It is true that Riddle thought Erskine had paid enough for the prop-

erty, but the other witness whom he introduced, Mr. Thread-gill, an habitual dealer in lands, swore that at the time of the sale the land was worth 37½ cents an acre, which would bring the amount to near $5,000. The statement of Riddle cannot be allowed to contradict the oath of the appellant, in his official capacity, and to outweigh the oath of his other witness on the sworn appraisement. The truth is, it is one of the best tracts of land in the west, and well worth $10,000, as the complainants state, at the time of the purchase.

4. Again, the record abundantly shows that the appellees were overreached in the purchase. They were residing in Louisiana, and knew nothing of the situation of their property — were in needy circumstances. Erskine, who had obtruded himself into the property and the administration, looks them up, causes them to be told that the property is located on, if not lost to them; is in great difficulty; that he and no one else can save it, etc., and induces a sale at one-fourth its value. It is true that he denies in his answer all fraud and misrepresentation, but he does not deny that these representations were made by his agent, the interpreter, who negotiated the contract. All the circumstances show that the vendors were overreached. In these cases, a court of equity does not require positive proof of fraud, but will infer it from the situation of the parties. [4 Dessaus. 652; 1 McCord's Ch. R. 390.]

5. The purchase of the house and lot in town by John Erskine, the son of the administrator, in payment of a debt due him by his father, as admitted in his answer, was void, and vested no title. It is well settled that such an abuse of the trust property does not change the title. [1 Story's Eq. § 533; 7 Vesey; 152; 2 Story's Eq. § 716; Watkins vs. Clark, 2 Sim. & Stewart, 204; 4 Kent, 307.] The purchaser not having complied with the terms of the sale by paying the purchase money, the heirs had a right to have the experiment of another sale, or to keep the property by defraying the expenses of the estate.

Again, there was no necessity of a sale. · The administrator was in debt to the estate, for rents, to more than the amount of

his disbursements, as the account would have shown if the proceedings had not been arrested by an appeal. There are many circumstances about this sale of the house which go to show an utter want of fair dealing. It appears from the obligation of the appellant, contained in the record, to pay the taxes on the San Antonio property, that the allegations of the appellees that they sold the Capote tract to save the town property, and that the appellant concealed the fact from them that it was sold, must be true. Why else did he give an obligation to pay the taxes on that property which was already sold? The whole business shows an effort to appropriate the estate by a Texas administration.

Mr. Justice LIPSCOMB delivered the opinion of the court.

The questions to be discussed in this case are:

Can an administrator purchase from an heir of his intestate his interest in the lands belonging to the succession?

Can the vendor, under such circumstances, at his option, set aside a purchase and sale so made, without showing any fraud on the part of the administrator in procuring such purchase?

There are supposed to have been decisions on the questions here presented, both in England and America, not easily to be reconciled; and the difficulty seems to have arisen in determining whether the parties are to be considered as occupying and standing in the relation of *trustee* and *cestui que trust* to each other; and if so, under what qualifications the rule, that a trustee to sell cannot purchase, is to be received. In discussing the restraints imposed on contracts between persons who stand in the relation of a fiduciary and beneficiary, Judge STORY says, " that the principle applies, however innocent the purchaser may be in a given case. It is poisonous in its consequences. The *cestui que trust* is not bound to prove, nor is the court bound to decide, that the trustee has made a bargain advantageous to himself. The fact may be so, and yet the party not have it in his power distinctly and clearly to show it. There may be fraud, and yet the party may not be able to show it. It is to guard against this uncertainty and hazard of abuse, and to remove the trustee from temptation, that the rule does and

will permit the *cestui que trust* to come at his own option, and, without showing any essential injury, *to insist upon having the experiment of another sale.* So that, in fact, in all cases where a purchase has been made by a trustee, on his own account, of the estate of his *cestui que trust*, to set aside the sale, whether *bona fide* made or not. It applies to the executors and administrators, who are not permitted to purchase up the debts of the deceased on their own account; but whatever advantage is thus derived by them, by purchase at an undervalue, is for the common benefit of the estate. Indeed, the doctrine may be more broadly stated, that executors and administrators will not be permitted, under any circumstances, to derive a personal benefit from the manner in which they transact the business or manage the assets of the estate." [Story's Eq. Juris. par. 322, p. 327, 328, vol. 3.]

The doctrine seems to be very general, and applied to every kind of trust; but we will see, by and by, whether the author designed to include a purchase of property made by an administrator from the heir.

In the case of Stallings & Wife *vs.* Foreman, Administrator, 2 vol. Hill's Ch. Rep. 405, Judge O'NEAL says: "The naked question in this case is, whether an administrator selling the personal estate of his intestate under an order of the ordinary, can be allowed to become the purchaser, when he sells fairly and pays the full value? I think he can; and that, in this respect, executors and administrators constitute an exception to the rule that *a trustee to sell cannot purchase.*"

On the circuit, it had been ruled that the sale was void, on the supposed authority of Edmonds *vs.* Crenshaw & McMorris, 1 McCord's Ch. Rep. 252, 260, in which the circuit judge supposed the doctrine to be broadly laid down, that an executor's purchase, at his own sale, was void, and the slave purchased still the property of the estate. Judge O'NEAL reviews this case, and shows that it was not decided on that principle, but on the ground that the executor had not complied with the terms of the sale, and had never paid the price. He also reviewed all the previous cases decided in that state, from the revolution down, and insisted that in none of them was it decided con-

trary to his opinion. The other judges, HARPER and JOHN-SON, concurred. This case seems to be directly against the doctrine of Judge STORY, in the text cited.

There is a note to the 3d volume of Story's Eq. Juris. 314, in which the opinion of Lord BROUGHAM, in Hunter *vs.* Atkins, 3 Mylne & Keene, 113, is given. His Lordship is very full and explicit in laying down what he conceived to be the principles governing contracts between persons standing in the relation of trustee and *cestui que trust.* He says: " There is no dispute upon the rules regulating, generally speaking, cases of this description. Mr. Alderman Atkins is either to be regarded in the light of an agent confidentially entrusted with the management of Admiral Hunter's concerns, a person, at least, in whom he placed a very especial confidence, or he is not. If he is not to be so regarded, then a deed of gift, or other disposition of property in his favor, must stand good, unless some fraud, by misrepresentation or suppression of facts, misled him, or he was of unsound mind when the deed was made. If the alderman did stand in a confidential relation towards him, then the party seeking to set aside the deed *may not be called upon to show direct fraud,* but he must satisfy the court, by the circumstances, that some advantage was taken of the confidential relation in which the alderman stood. If the alderman stood in any of the known relations to the admiral, of guardian and ward, attorney and client, trustee and *cestui que trust,* then, in order to support the deed, he ought to show that no such advantage was taken; that all was fair; that he received the bounty freely and knowingly on the giver's part, and as a stranger might have done. For I take the rule to be this: there are certain relations known to the law — as attorney, guardian, trustee. If a person standing in this relation to client, ward or *cestui que trust, takes a gift* or makes a bargain, the proof lies upon him that he has dealt with the other party, client, ward, etc., exactly as a stranger would have done; taking no advantage of his influence or knowledge; putting the other party on his guard; bringing everything to his knowledge which he himself knew. In short, the rule, rightly considered, is, that a person standing in such rela-

tion must, before he can take a gift or enter into a transaction, place himself exactly in the same situation a stranger would have been in, so that he gain no advantage whatever from his relation to the other party beyond what may be the natural and unavoidable consequence of kindness arising out of that relation," etc., etc.

He says "that the ruling in Gibson *vs.* Jeyes, 6 Vesey, 277; Wright *vs.* Proud, 15 Vesey, 138; Hatch *vs.* Hatch, 9 Vesey, 296, and Harris *vs.* Tremenheer, 15 Vesey, 40, amounts to nothing more than that in such cases suspicion attaches on the transaction, and calls for minute examination. That these cases are all consistent with the rules in the above opinion in Hunter *vs.* Atkins."

These cases are referred to by Judge STORY in support of the more stringent rule, that the sale can be set aside at the option of the *cestui que trust;* and yet it does not seem that Lord BROUGHAM carried the doctrine to that extent. I have before intimated that Judge STORY may not have been correctly understood in the text cited from his Equity Jurisprudence. He may not have intended that his remarks should apply to a contract of sale of property between the trustee and *cestui que trust,* in which the trustee was the purchaser and the beneficiary the vendor. That he did not intend that the rule laid down by him, in his text, should be taken without some restrictions, would seem to be fairly inferable from his remarks in sec. 316, p. 321, in which he says: "In all cases of purchases and bargains respecting property, directly and openly made between principals and agents, the utmost good faith is required; the agent must conceal no facts within his knowledge which might influence the judgment of his principal as to the price or value." Again, the illustrations given in the text cited first, in which the rule is supposed to be laid down, that in all cases of trust the sale could be set aside at the option of the beneficiary, whether fair or not so, on a critical examination, will not bear the construction in the unqualified manner supposed by some. "As if an agent sells to his principal his own property as the property of another without disclosing the fact, the bargain, at the election of his principal, will be held

void. So, if an agent, employed to purchase for another, purchases for himself, he will be considered the trustee for his employer. Therefore, if a person is employed as an agent to purchase up a debt of his principal, he cannot purchase the debt on his own account, for he is bound to purchase it at as low a rate as he can, and he would otherwise be tempted to violate his duty." Similar illustrations are given in the text, in relation to an executor and administrator, who is not permitted to purchase the debt of the deceased on his own account. And, again, in the text it is said that "in all cases where a purchase has been made by a trustee, on his own account, of the estate of his *cestui que trust*, although sold at public auction, *that the rule does and will permit the cestui que trust to come at his own option, and, without showing essential injury, to insist on the experiment of another sale.*"

From which it may be understood that it was not intended to extend the rule to any other contract of sale than such as were made under a trust to sell, and not to a contract of sale of property made by the beneficiary to a trustee not authorized to sell. If this was the true meaning of the text, the difference between these eminent jurists consists in this: that Judge STORY says, if a trustee to sell is the purchaser, it is voidable at the mere will of the beneficiary; and Lord BROUGHAM rests it on the good faith of the transaction, making the same *prima facie* voidable, and throwing the burthen on the agent to rebut the presumption, and show the good faith of the transaction. It has been shown that, according to the doctrine held in South Carolina, in Stallings & Wife *vs.* Foreman, executors and administrators who sell under an order of the court constitute an exception to the rule *that a trustee to sell cannot purchase*, and that they can purchase.

Between such distinguished jurists, it is a difficult and somewhat invidious task to decide which should be preferred. Nevertheless it is a duty we have to perform. We, therefore, I trust, with becoming diffidence, are constrained to believe that the rule laid down in Hunter *vs.* Atkins is well sustained by authority; and that, on principle, it is safer and better cal-

27

culated to accomplish the ends of justice, without encroaching on the freedom of the will of parties to a contract, than the rule sanctioned by the authority of Judge STORY. Restraints on the will of the contracting parties should seldom be imposed, unless absolutely necessary to secure the rights of others or to sustain the general policy of the law. It is, however, the duty of courts, by the application of well acknowledged, judicious rules of evidence in the administration of the law, to give effect to what is intended to shield the weak, the dependent and confiding from the deceitful practices, the cunning and fraud of those who may attempt to avail themselves of circumstances that may enable them to use such advantages. But, at the same time, much care should be observed to prevent what was intended as a shield from being made the occasion of the perpetration of frauds as great as those designed to be prevented. If the beneficiary can, at his will, without assigning any want of fairness in the transaction, set it aside, I am not aware of any law requiring it to be done in any given time; and it would certainly enable him to speculate on the chances of the appreciation of the property he had sold fairly, with a full knowledge of his title, and the value at the time when sold. Should it depreciate in value, he would never be heard to complain, and ask that it should be set aside; but should it appreciate, he would claim the advantage. A rule that would permit this to be done can neither be required by an enlightened policy nor be sanctioned by principles of sound morality.

The very case before the court, should it be held that the fact of the plaintiff in error being an administrator made him a trustee to sell, would present, in the strongest light, the unsoundness of the rule, and the flagrant injustice that might be perpetrated under its influence. The year 1844 will long be remembered as the period of the greatest gloom and depression in the hopes of the friends of Texas. A want of money, of credit, and of confidence in the permanency of the government, prevailed to such an extent that few, from the Brazos westward, would have remained, if they had possessed the

means of getting away, or could have been permitted to carry their slaves to a place of greater security, under the protection of the law. Few, however sanguine their hopes, believed that land possessed any intrinsic value. Whether it was worth anything was a matter of mere speculation, dependent on the chapter of accidents. It was at this time of darkness and distress, that the vendors, then domiciliated beyond the limits of the republic, in the state of Louisiana, sold the land in question. The record shows that they were not ignorant of their title to the land; and from the fact of their non-residence, it may be inferred that they had no confidence in the government to give protection to persons and property. The fact of the vendors being domiciliated out of Texas has been referred to, not that their title to the land, at the time of the sale, is to be decided; but as their title might be questioned on that ground, it has been merely incidentally noticed as one, among other circumstances, by which the transaction was attended, that may justly have been taken into consideration by the parties. The deed was made in Louisiana, but was acknowledged and proved by one of the parties after accompanying the vendee to Texas.

But a great and happy change in the prospects of the country had been brought about. The troops of the United States had taken a position on the frontier, and displayed the ægis of their standard between the citizens and the enemy. Confidence was restored; annexation of Texas to the United States had been consummated, and none doubted her disposition or ability to sustain her engagements. It was not until after these changes had been brought about that the vendors asked to set aside the sale they had made under such different circumstances. The common sense of mankind, and common honesty, would put the seal of condemnation on a rule by which such gross injustice was sought to be perpetrated. There is no pretense that the vendee, in this case, was the agent of the vendors when the purchase was made. There was no privity between them. If he had been their agent to attend to their land, to collect information as to title, quantity or quality, and he had purchased, it would have been incumbent on him to have shown,

by proof, that he had given them all the information, on those subjects, known to himself. If there had been an agency, however, I should have thought, from their bill and the testimony, there were no facts within his knowledge material to the interest of the vendors, that may not be fairly inferred, as a reasonable presumption, to have been known by them. If any of the relations known to the law existed between them, it arose from the fact of the vendee being the administrator, and that it was a trust. Whether the fact of the vendee being the administrator of the succession of the vendor's ancestor, from whom they derived title, created such a trust, will next be inquired into.

In the case of Stallings & Wife vs. Foreman, Administrator, it has been seen that the court of appeals of South Carolina decided that a sale and purchase made by the administrator, at his own sale, was an exception to the rule that a trustee to sell cannot purchase. The exception to the operation of the rule is believed to be well taken, and fully sustained by the opinion, from authority. But I apprehend that another exception may well be taken, that an administrator in this state is not, from the mere fact of being administrator, a trustee to sell; that one may, under certain circumstances, be a trustee with a power to sell, technically speaking, may be true. At common law, it is believed that an administrator could sell without an order of court.

Under such circumstances, it seems that, in principle, he would stand a trustee with the power to sell. At least, his position would be analogous to a trust of that kind. By the laws of the republic, in force at the time of the purchase under consideration, an administrator had no power to sell without an order of court. When selling under an order of court, he would, *quoad* the property ordered to be sold, be a trustee with power to sell; but, according to authority, he would have a right to purchase, as, at that time, we had no law prohibiting the administrator from purchasing. He is now, however, prohibited by the act of the legislature (1st session) organizing the probate court. In Drayton vs. Drayton [1st Equity Rep. 557, 567], the judges say to G. Drayton, purchasing at the sale of the

testator's estate: "We consider it in the same light as that of any other individual. There is no law which prohibits an executor purchasing, without fraud, any property of his testator, at open public sale." Judge O'NEAL, commenting on this case, says "that it was decided in exact conformity to what he conceived to be both law and equity; and that it had continued to be so considered ever since, though decided as far back as 1797." [2 Hill. Ch. Rep. 405.] If the purchaser, under such circumstances, is to be considered precisely as any other individual, I can perceive nothing to prevent his meeting, in contract, the heir, and purchasing his interest in his ancestor's estate, precisely as any other individual. If, in the instances before mentioned, he could purchase without the responsibility of assuming the burthen of proof, as in the case of a trustee with power to sell, I can perceive no reason why the vendee, in this case, should be placed under such obligation. He surely cannot be, if he is to be viewed precisely as another individual. He is certainly not a trustee, unless made so in his character of administrator. Trusts are created by the agreement of parties or by operation of law. There is no pretense of his having been created trustee by the agreement of the parties, and he has done no act from which an implied trust, by operation of law, can be raised. The policy of the law imposes no impediment against his purchasing from the heir his interest, because the rights of creditors are not affected by such purchase, as the land, in law, would still be subject to the payment of the debts of the deceased.

If, then, the parties are to be considered as any other individuals, we must look to the bill, answer and proof to determine the correctness of the decree. If the vendors have not made out a case entitling them to relief, the bill ought to have been dismissed. For on them rests the burthen of proof that the purchase was made and obtained by the fraud of the vendee.

The allegations of the bill are fraud and concealment on the part of Erskine, the vendee, misrepresentation and inadequacy of price. The answer unequivocally denies all of these allegations. There was no testimony except as to the value of the

land; and on this subject the evidence was altogether unsatisfactory, and entirely failed in establishing an inadequacy of price, from which fraud was shown. One witness made the price given greatly under the value, and the other thought that too much had been given. It is a well settled rule that, in the absence of all proof, an answer, denying all the equity, must be taken as conclusive. This disposes of the charge of fraud, concealment and misrepresentation. The remaining ground is, the inadequacy of the consideration paid. The evidence does not sustain this charge. It was incumbent on the complainants to support it by sufficient proof. The charges in the bill, in relation to the sale of the land by the three De la Baums, are unsustained and ought to have been dismissed. The decree must have been based upon one of two hypotheses: that an administrator cannot purchase from the heir, however fair the transaction; or that if he does purchase, it is with the responsibility of assuming the burthen of proof. It is believed that neither of the two propositions is sustained by the law, but that such contract is to be tried as between strangers.

We will examine, now, that part of the case in which the sale of the house and lot in the town of San Antonio, under the order of the probate court, is sought to be set aside.

The bill, it may be remarked, is very objectionable; and, had it been excepted to, the complainants would have been required to amend. It is objectionable in this: that it mixes up distinct matters and joins improper parties. None of the complainants had any interest in the sale of the land which was sought to be set aside but the three vendors, and yet they were all made parties. The same may be said of the defendant, John Erskine. He had no interest whatever in the sale made by the three De la Baums to his father. These matters should have been kept separate. It is only to the last part of the bill, in relation to the sale of the house and lot in San Antonio, that the proper parties were made. The charge of a fraudulent combination between the administrator and the purchaser is fully denied in the answer; and the proof further shows that it was sold for its full value. There is nothing in the evidence to sustain

any material fact charged; nor is there any such irregularity in procuring the order of sale from the probate court to justify setting the sale aside.

That it was necessary to sell some property is made manifest; and the property sold was supposed, by the attorneys representing the absent heirs, as most likely to sell for its full value; and it was sold for more than the amount of the appraisement. I believe the whole bill ought to be dismissed, and this is the opinion of the court.